# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LANCE CHRISTIAN** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | **Civil Action No. 3-03-1033** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act").  The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.  Docket Entry No. 8.  Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 11.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I.  INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits on September 27, 1994, alleging that he had been disabled since November 7, 1993, due to chronic manic depression.  *See, e.g.,* Docket Entry No. 4, Attachment ("TR"), pp. 57-60, 129-134.  Plaintiff's application was denied both initially (TR 76-80) and upon reconsideration (TR 99-101).  Plaintiff subsequently requested and received a hearing.[1]  *See, e.g.,* TR 342.  Plaintiff's hearing was conducted on December 12, 1995, by Administrative Law Judge ("ALJ") Richard T. Enright.  *See* TR 342-345.  Plaintiff and Vocational Expert, Darrell Taylor, appeared and testified.  *Id.*

On May 30, 1996, the ALJ issued a decision favorable to Plaintiff, finding that Plaintiff was disabled within the meaning of the Social Security Act and Regulations, and finding that Plaintiff was entitled to a closed period of disability and disability insurance benefits commencing November 7, 1993, and ending August 20, 1995.  TR 342-345.

Plaintiff appealed, challenging the ALJ's finding that his disability ceased on August 20, 1995.  *See* TR 356.  On September 20, 1997, the Appeals Council remanded the case, and Plaintiff received another hearing.  TR 16, 355-358.  Plaintiff's second hearing was conducted on June 1, 1998, by ALJ James L. Simpson III.  TR 443-477.  Plaintiff, Plaintiff's mother, Barbara  J. Wade, Medical Expert, Dr. Gary Maryman, and Vocational Expert, Robert Piper, appeared and testified. *Id.*

On June 24, 1998, the ALJ issued a decision partially favorable to Plaintiff, extending his

---

[1]The December 12, 1995 hearing transcript is not available in full.

disability period from August 20, 1995 to May 31, 1998.[2] TR 16-21. Specifically, the ALJ made

the following findings of fact:

1. The claimant was found to be no longer disabled within the meaning of the Social Security Act on August 20, 1995, and he has not engaged in substantial gainful activity since that date.

2. The medical evidence establishes that the claimant currently has severe major depression, recurrent.

3. The medical evidence establishes that between August 21, 1995, and March 24, 1998, the claimant's impairment met the criteria of Medical Listing 12.04 of Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations of impairment between August 20, 1995, and March 24, 1998, are credible.

4. [*sic*] The claimant was disabled within the meaning of the Social Security Act from August 21, 1995, until March 24, 1998.

5. The medical evidence establishes that there has been improvement in the claimant's medical impairment since March 24, 1998.

6. This medical improvement is related to the claimant's ability to work (20 CFR 404.1594 (c)).

7. The medical evidence establishes that the claimant's impairment, major depression, recurrent, is currently severe, but does not meet or equal the criteria of a Medical Listing.

8. The claimant's allegations of impairment since March 24, 1998 are not supported by the objective medical evidence of record, therefore his allegations are not credible.

---

[2]The ALJ determined that Plaintiff's disability period actually ceased on March 24, 1998 (*See* TR 18-19), but that Plaintiff's entitlement to benefits "ended effective May 31, 1998, the end of the second calendar month after the month in which the disability ceased" (TR 21).

3

9. Since March 24, 1998, the claimant has had the residual functional capacity to perform low stress work without exertional limitations (20 CFR 404.1565 and 416.965).

10 The claimant's past relevant work as a hand packer or statistical clerk did not require the performance of the work-related activities precluded by the above limitations (20 CFR 404.1565 and 416.965).

11. The claimant's impairment has not prevented him from performing his past relevant work since March 24, 1998.

12. The claimant's disability ceased on March 24, 1998 (20 CFR 404.1594 (f)(7)).

TR 19-21.

On August 27, 1998, Plaintiff timely filed a request for review of the hearing decision. TR 10. On August 14, 2000, the Appeals Council issued a letter declining to review the case, thereby rendering the decision of the ALJ the final decision of the Commissioner.[3] TR 8. This civil action was later filed, and the Court has jurisdiction.[4] 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

---

[3]Plaintiff apparently did not receive this letter. *See* TR 3, 4.

[4]Because Plaintiff apparently did not receive the August 14, 2000 letter from the Appeals Council, he requested, and received, permission to proceed with this lawsuit even though his Complaint was not timely filed. *See* TR 3, 4.

4

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence Considered in Plaintiff's December 12, 1995 Hearing[5]

Plaintiff alleges disability due to chronic manic depression.  TR 129-134.

Plaintiff was admitted to USAF Medical Center at Wright Patterson AFB, Ohio, on March 28, 1984, and was examined by Maj. John R. Vanin, staff psychiatrist.  TR 176-178.  On April 18, 1984, Maj. Vanin examined Plaintiff and noted that Plaintiff had a history of experiencing sporadic bouts of depression since 1979.  TR 176.  In addition to his depression, Plaintiff complained of experiencing periods of anxiety.  *Id.*  Plaintiff underwent a mental status examination, which revealed that Plaintiff "was alert and oriented," his "speech was slow," there were "no suicidal or homicidal ideations," and his "memory was intact."  TR 177.  While at the hospital, Maj. Vanin prescribed Plaintiff "Amitriptyline 200 mg p.o.q. h.s."  *Id.*  Plaintiff "showed significant improvement in the depression during his hospital course."  *Id.*  Maj. Vanin determined that Plaintiff did not pose a danger to himself or others.  TR 178.

On April 29, 1984, Plaintiff was operated on to repair a right inguinal hernia.[6]  TR 260.

On September 27, 1988, Plaintiff was admitted to Wilford Hall USAF Medical Center at Lachland AFB, Texas.  TR 181.  Upon admission, Plaintiff stated that, "if he did not get help soon, he would be past the point of no return."[7]  *Id.*  Capt. Susan McManis, and Dr. Maureen

---

[5]The administrative record before this Court does not contain the hearing transcript from Plaintiff's December 12, 1995 hearing.  The evidence discussed herein was part of the record at the time of the first hearing, however, and was considered by the ALJ in the second hearing.  The unavailability of the transcript from the December 1995 hearing does not bear on the issues currently before this Court.

[6]Following this surgery, Plaintiff has had many surgeries to repair recurrent hernias.

[7]*See* TR 261-267 for a narrative summary of Plaintiff's history.

5

Hackett diagnosed Plaintiff with:

> Major depression, single episode. Severe. [W]ithout psychotic features. [A]s manifested by 2 months of dysphoria. [D]ecreased energy. [D]ecreased sleep. [D]ecreased appetite. [D]ecreased concentration. [D]ecreased interest. LOD: Yes. Military Impairment: Marked. Social and Industrial Impairment: Considerable.
>
> Dysthymia. Primary type. [E]arly onset as manifested by greater than 2 years of dysphoric mood with neurovegetative symptoms.
>
> Axis II: Deferred. However, dependent, immature, passive aggressive, and avoidant features noted by the patient depending on others to make decisions. [F]eelings of inadequacy. [H]is style of holding anger inward and not confronting others. [A]nd his tendency to keep to himself.

TR 183-184.

Capt. McManis and Dr. Hackett noted that Plaintiff "presents with chronic dysthymia with a superimposed major depression, necessitating his second psychiatric hospitalization and this condition may well continue into the future." TR 184. Capt. McManis and Dr. Hackett recommended that Plaintiff continue being treated with "Nortriptyline [*sic*] 125 mg," to continue after discharge. *Id.* Plaintiff was discharged from the hospital on January 18, 1989.[8] TR 188.

On October 6, 1988, Maj. Sandra S. Klassy evaluated Plaintiff in occupational therapy. TR 179. She observed Plaintiff to be "clean and neatly attired." *Id.* Maj. Klassy noted that Plaintiff evinced a desire to overcome his illness, but seemed "not willing/able to initiate such change, and looked to an outside source(s) as enablers." *Id.* Maj. Klassy recommended continuing activities and exercises, improving self-esteem to "facilitate internal focus of control," and improving the ability to independently start tasks, energy levels, and goal-setting

---

[8]The consultation sheet from this date is illegible. TR 189.

6

skills.  *Id.*

On February 21, 1989, Dr. J. W. Keanus, staff psychologist, noted that Plaintiff had
sporadic recurring bouts of depression.  TR 191-193.  Dr. Keanus recommended providing
supportive care and follow-up.  TR 192.  On March 21, 1989, Dr. Keanus reported that Plaintiff
had been "doing fairly well these past few weeks."  TR 193.  Dr. Keanus recommended referral
to a physician for medical review, to "increase amitryptiline," to "provide supportive
monitoring," and "RTC (Psychol. & Psychiat. Red.)."  *Id.*

On May 8, 1989, Dr. Judith Kaas Weiss, performed a psychological evaluation of
Plaintiff.  TR 276-282.  She noted that Plaintiff was "alert and responsive," and that Plaintiff
admitted to "frequent suicidal thoughts."  TR 277.  Plaintiff reported that he "shies away from
people and is withdrawn."  TR 278.  Dr. Weiss noted that Plaintiff "claims to have difficulty
understanding what is said to him and to have significant memory impairment."  TR 281.  Dr.
Weiss administered the WRAT-R and WAIS-R tests, and she determined that Plaintiff "is of at
least average intellectual ability."  TR 278.  Administration of the Wechsler Adult Intelligence
Scale–Revised to Plaintiff yielded a Verbal I.Q. of 92, a Performance I.Q. of 99, and a Full Scale
I.Q. of 95.  TR 280.  Dr. Weiss also administered the Rorschach test, and concluded:

> Mr. Christian gave thirty-three responses to the Rorschach.  This is
> a remarkable profile, characterized by fabulized combinations and
> unpleasant tone.  Fabulized combinations are associated with
> regression (perhaps in schizophrenia), isolation type of
> detachment, obsessive-compulsive neuroses, and autistic thought
> processes.  Unpleasant dysphoric tone or emotions have been
> associated with anxiety, possible schizophrenia, and possible
> depression; Mr. Christian responded to Plate VII, "small face of
> person with frown . . . looking right at me."  A comprehensive
> psychiatric evaluation would appear to be warranted.

TR 281.  Dr. Weiss diagnosed Plaintiff with "Major Depression, Recurrent (severe, without

7

psychotic feature)," and "Organic Mental Disorder Not Otherwise Specified (Provisional)."  TR 282.

On May 17, 1989, Dr. Gillian Blair completed a Psychiatric Review Technique of Plaintiff.  TR 42-50.  Dr. Blair determined that a Residual Functional Capacity assessment was necessary because of the presence of an affective disorder.[9]  TR 42.  He noted that there was no evidence present of "sign or symptom CLUSTER or SYNDROME" of an "organic mental disorder," "schizophrenic, paranoid, and other psychotic disorders," "mental retardation and autism," "anxiety related disorders," "somatoform disorders," "personality disorders," or "substance addiction disorders."  TR 44, 46-48.  Dr. Blair noted the presence of a "disturbance of mood," characterized by "sleep disturbance," "decreased energy," "difficulty concentrating or thinking," "thoughts of suicide," and "'possibly' paranoid thinking."  TR 45.  Dr. Blair further noted that Plaintiff did not evidence "Manic syndrome," but that Plaintiff had a "slight" "restriction of activities of daily living," and had, "at most," "moderate" "difficulties in maintaining social functioning."  TR 45, 49.  Plaintiff "seldom" had "difficulties of concentration that resulted in a failure to complete tasks," and had "once or twice" experienced "episodes of deterioration or decompensation in work or work-like settings which caused the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behavior)."  *Id.*

Dr. Blair also completed a Mental Residual Functional Capacity Assessment of Plaintiff, and noted "moderate" limitations in Plaintiff's "ability to maintain attention and concentration for extended periods," in his ability to interact appropriately with the general public, and in his

---

[9]The doctor's notes are illegible.

8

ability to get along with coworkers without distracting them. TR 51-52. Dr. Blair noted that

Plaintiff's "lifelong I.Q." was "over 95." TR 53. Dr. Blair's diagnosis was "Major depression."

*Id*. He noted that Plaintiff "retains ability for multi-step variable tasks," and that Plaintiff's

"concentration may be variable, but is adequate for public work." *Id*. He further noted that

Plaintiff had "adequate" social skills, although Plaintiff demonstrated some "avoidance/

withdrawal." *Id*. Dr. Blair recommended work settings that did not require "interaction with the

general public," and opined that small groups of two to four workers would be suitable. *Id*. Dr.

Blair noted that Plaintiff was able to drive and to travel. *Id*.

On May 19, 1989, Vocational Specialist, Trula Crink, opined that Plaintiff had the

capacity to work in "skilled, semi-skilled or unskilled work that deals primarily with things

rather than with the public at any exertional level." TR 162.

Plaintiff was seen by a psychologist, and underwent a medical reevaluation by a medical

doctor on September 8, 1989.[10] TR 195-198. The physician diagnosed "bipolar illness" and

prescribed Lithium (300mg), and a continuation of the "flavil" Plaintiff had been taking. TR

198.

Plaintiff had another check-up on November 13, 1989. The physician prescribed Prozac

(20 mg) and noted that Plaintiff's depression remained "recurrent, despite compliance with

meds."[11] TR 199.

On December 26, 1989, Plaintiff had another check-up, during which the doctor

_____

[10]Both the psychologist's and the examining physician's name are illegible.

[11]The physician's name is illegible.

prescribed him "Phenolzine 15 mg BOD."[12]  TR 200.  On December 26, 1989, another doctor examined Plaintiff's right elbow for pain.[13]  TR 245.

On April 25, 1990, Plaintiff was examined by Capt. George Munkachy at Wright-Patterson AFB.  TR 274-275.  Capt. Munkachy diagnosed "Major depression, recurrent, without psychotic features," and "dysthymia, chronic, EPTS, not rated."  *Id*.  Capt. Munkachy recommended further care on an outpatient basis.  TR 275.

On May 22, 1990, Plaintiff had surgery to repair a hernia on his left side.  TR 202-204.

On June 20, 1990, Plaintiff's physician noted that Plaintiff "has been doing very well."[14] TR 204.  The doctor also determined that Plaintiff's depression "went in remission," but recommended that Plaintiff take "Phenelyline" if it were to recur.  *Id.*

In August and September 1990, Plaintiff underwent another herniography and had surgery on his left side.  TR 206-207.

On October 10, 1990, Plaintiff's physician reported that Plaintiff was "already off medication . . . and doing well."[15]  TR 208.  The doctor noted that Plaintiff "continued to do well despite the lack of treatment," and stated that, "There are no extra indications regarding his ability to hold a job at the present time."  *Id*.

On February 21, 1991, Plaintiff relapsed and admitted himself to the Veteran's Administration Medical Clinic in Louisville, KY, stating that he would "rather be dead" than feeling "so depressed."  TR 287-289.  Dr. Judy Wylde noted that Plaintiff was "cooperative."

---

[12]The physician's name is not specified.

[13]The name of the doctor who examined Plaintiff is not indicated in the record.

[14]The physician's name is illegible.

[15]The physician's name is illegible.

TR 287.  Plaintiff "was treated with Nardil, 15mg, t.i.d. and Lithium Carbonate, 600 mg, b.i.d,"

and Dr Wylde noted that Plaintiff  "did very well," coming "from the severe depression to no

clinical depression during his depression therapy group."  TR 288-289.  Dr. Wylde noted:

> Needs some time before he can go back to full time employment.
> The patient is willing to go back to school starting in May.  Most
> probably, the patient would not be able to go back to work for
> another six months.  He can go back to his original activities
> before he came to our hospital.

 *Id.*  Plaintiff was discharged on March 14, 1991, with a notation that his condition was

"improved."  TR 289.

On March 14, 1991, Dr. George R. Bowen of Psychology Services noted that Plaintiff

was attending depression group therapy sessions, and that, despite some continued depression,

his condition was "consistent with absence of clinically significant depression."  TR 209.  Dr.

Bowen reported that Plaintiff's condition had improved from where it was before he began

medical treatment.  *Id.*  Dr. Bowen concluded:  "Treatment goal met."  *Id.*

On March 30, 1991, Dr. Daniel A. Borders administered a psychiatric evaluation to

Plaintiff.  TR 290-292.  Dr. Borders noted that Plaintiff was "oriented in all three fields."  TR

291.  Dr. Borders diagnosed Plaintiff with "bipolar disorder, depressed," and he noted that "the

patient has had both elevated and depressed mood with other symptomatology and a cyclic

pattern."  TR 292.

On April 22, 1991, Plaintiff's physician noted that Plaintiff's "sleep and appetite are

adequate."[16]  TR 210.

---

[16]The physician's name is illegible.

On June 6, 1991, Plaintiff returned to his doctor for a check-up.[17] TR 212.

On June 11, 1991, Dr. Terre Quinn-Martin performed a "flexible sigmoidoscopy and polypectomy" on Plaintiff's colon. TR 248-249.

Between May 1991, and June 1991, Plaintiff underwent procedures to remove a polyp. TR 211-215. Plaintiff continued to experience hernia problems and he underwent surgery on October 10, 1991. *See* TR 217-219, 220.

Plaintiff had check-ups on July 31, 1991, and on October 23, 1991.[18] TR 216. On October 23, the physician noted that Plaintiff had "been doing fairly well without symptoms of depression." *Id.*

Plaintiff went to his physician again on June 16, 1992.[19] TR 227.

On September 14, 1992, Plaintiff visited his primary physician, complaining of a "deterioration" in his condition, and stated that he was willing to see "any expert" that might be able to help him.[20] TR 228. Plaintiff's physician referred him to Dr. Rif S. El-Mallakh. *Id.*

Plaintiff was evaluated on November 4, 1992, by Dr. El-Mallakh at the Bipolar Clinic. TR 223-226. Dr. El-Mallakh noted symptoms of "depressed mood," "bad energy," "frustration," "irritability," "forgetfulness," and "difficulty concentrating and thinking," and he reported that Plaintiff was "dispirited and nearly hopeless." TR 223. Dr. El-Mallakh noted that Plaintiff's mood seemed "Depressed Frustrated," with an affect that was "generally anxious but good range

---

[17]The results of this appointment and the name of the physician are illegible.

[18]The progress report from July 31 is short and illegible, and the physician's name is illegible on both occasions.

[19]The transcript and the physician's name are illegible.

[20]His treating physician's name is illegible.

12

of expression." TR 226. Dr. El-Mallakh also noted that Plaintiff was resistant to single agent antidepressants, and that there was a family history of bipolar disorder in Plaintiff's son. TR 226. Dr. El-Mallakh reported that Plaintiff also complained of erectile dysfunction, which he thought may be related to the Nardil that Plaintiff was taking. TR 224, 226. Dr. El-Mallakh recommended that Plaintiff's prescription of Lithium be changed to 600 mg in the morning, and 900 mg in the evening, and he also prescribed Tegretol 200 mg BID to 400 mg BID. TR 226.

On December 2, 1992, Dr. El-Mallakh reported "slow, consistent improvement only over the last week." TR 229. He noted that Plaintiff was "stable with some improvement on combo of Li/Tegretol." *Id*. Dr. El-Mallakh recommended that Plaintiff continue to "slow taper Nardil (now on 2 pills/ day)," and to "start Prozac in two weeks." *Id*.

On January 20, 1993, Dr. El-Mallakh reported that Plaintiff had "worsened off Nardil and restarted himself on them–now great; no symptoms." TR 230. Dr. El-Mallakh noted that Plaintiff's erectile dysfunction had disappeared and was "prob[ably] part of the depression." *Id*. Dr. El-Mallakh recommended that Plaintiff remain on all medication and that he "start Lomotil, Tab PO QID PRN diarrhea" to help him tolerate the side effects of the Lithium. *Id*.

On February 24, 1993, Dr. El-Mallakh reported that Plaintiff "continued to do well," and "does ok at work and socially." TR 232. However, Plaintiff continued to complain of "Persistent diarrhea despite Lomotil," and an "OCC tremor." *Id*. Dr. El-Mallakh noticed several "red stressors," including troubles in Plaintiff's current relationship and the behavior of his son. *Id*. He observed Plaintiff to be "bright, energetic." *Id*. Dr. El-Mallakh recommended substituting "Li Citrate liquid–more complete" for the Lithium to counteract the diarrhea, and he recommended that Plaintiff maintain the same doses of his other medications. *Id*.

On July 30, 1993, Plaintiff returned to his doctor for medication refills.[21] TR 259.

On August 25, 1993, Dr. El-Mallakh noted that Plaintiff reported that he felt "great," with "[n]o symptoms." TR 231. Plaintiff appeared "bright, energetic." *Id*. Dr. El-Mallakh recommended that Plaintiff continue to take Lithium, Tegretol, and Nardil. *Id*.

On December 15, 1993, Plaintiff was examined in St. Louis by Registered Nurse Louise Randolph and a physician whose name appears to be Dr. Bernard Fleming. TR 233-234. Nurse Randolph reported that Plaintiff stated that his "moods have been stable for the last two years," and that none of the other medication combinations have "worked as well as the present combination." TR 233. Dr. Fleming reported that Plaintiff was a "pleasant man who can give a clean history and who appreciates his need for medication." TR 234.

On February 9, 1994, Dr. Patricia Wakefield saw Plaintiff and noted that there was "no tremor or confusion."[22] TR 235-236. Dr. Wakefield also noted that Plaintiff "has been reasonably stable since 1992," and that his "Bad periods are shorter or less intense." TR 235. She indicated that Plaintiff's "Moods still fluctuate," and that he continued to experience "lethargy and confusion." *Id*. She noted that Plaintiff was "fluent, coherent, logical." *Id*. She further noted: "No psychosis–no lethal ideation. Affect appropriate [–] Mood depressed." *Id*. Dr. Wakefield recommended increasing Plaintiff's dosage of Lithium to "1500 mg daily, checking Lithium levels in five days and ten days." *Id*.

Plaintiff returned to Dr. Wakefield on March 2, 1994, and reported "little improvement on [increased] LiCo3." TR 237. Plaintiff was instructed to "increase LiCo3 to 1500 mg and

_____

[21]The doctor's name is illegible.

[22]Dr. Wakefield's first name does not appear on the reports, However, she is listed as Patricia Wakefield in Plaintiff's application for Social Security. TR 130.

obtain Lit level on 3/7 and 3/11." *Id*.

Plaintiff was again seen by Dr. Wakefield on March 7, 1994, who noted: "[Plaintiff was] very discouraged over failure to be helped over past 12 years. Feels he has no future. Might as well die. Virtually begged for ECT to help lift the depression. Not acutely suicidal." TR 238. Dr. Wakefield opined that Plaintiff had "No intercurrent serious illness." *Id*. She noted that Plaintiff was "fluent, coherent, logical . . . constricted affect, slowed speech," had "Good eye contact," and "I/J preserved." *Id*. She planned to increase his dosage of Lithium to "1800 from 1500." *Id*.

On March 10, Plaintiff's lithium levels had risen to .98. TR 237. Plaintiff reported diarrhea, but stated that "today is the first day I really feel good." *Id*.

On March 25, 1994, however, Plaintiff's then-fiancé called Dr. Wakefield, "stating he was deteriorating rapidly," but that it was not an "emergency situation." TR 237.

On April 8, 1994, Dr. Wakefield reported that Plaintiff was still "profoundly depressed." TR 239. She reported that Plaintiff also experienced the onset of a tremor since his Lithium had been increased to 1800. *Id*. Dr. Wakefield noted that she "Will discuss with Dr. Partap the possible indications for ETC. Meanwhile, cont. current regimen."[23] *Id*. On April 29, 1994, Dr. Wakefield reported that Dr. Partap recommended "admission for complete reassessment." *Id*. Plaintiff, however, reported feeling "better" and wanted to "defer admission." *Id*.

On May 2, 1994, Dr. Wakefield reported that Plaintiff was "very depressed and tired," and opined that he was "operating at 30% mental efficiency." TR 240. Plaintiff indicated that he was willing to switch from Nardil to Prozac. *Id*. Dr. Wakefield reported that Plaintiff was

---

[23]Dr. Partap's first name is not stated in the record.

15

"Not suicidal but so depressed he prays to die." *Id.* Plaintiff reported feeling like "he was living in a state of acute grief nonstop." *Id.* Dr. Wakefield noted that there was "No intercurrent serious illness," and recommended that Plaintiff continue taking Tegretol and Lithium, while "taper[ing] off Nardil, decrease 50% x 1 wk then d/c. begin Prozac 20 mg, to begin no sooner than 2 wks after last Nardil dose." *Id.*

On June 13, 1994, Dr. Robert S. Hicks completed a psychiatric evaluation of Plaintiff. TR 310-312. Dr. Hicks opined: "1. Probable Bipolar affective disorder, depressed at present. 2. Personality disorder not otherwise specified." TR 311. Dr. Hicks recommended that Plaintiff continue taking Prozac, and he noted a "course of ECT" if Plaintiff's condition did not improve. *Id.*

On November 8, 1994, Dr. Hicks wrote a letter to the Bureau of Disability Determinations stating that: "from my observation [Plaintiff] can for short periods of time function normally and perform gainful employment. The frequency and unpredictability of his mood swings, however, make it impossible for him to maintain any kind of regular job." TR 302-303.

Dr. Donald Henson completed a Psychiatric Review Technique form of Plaintiff on December 2, 1994. TR 66-74. Dr. Henson determined that Plaintiff had "Major depression, recurrent, in partial remission," and he noted that Plaintiff suffered from "sleep disturbance," "psychomotor agitation or retardation," "decreased energy," and "feelings of guilt and worthlessness." TR 67, 69. Dr. Henson indicated that Plaintiff suffered a "moderate restriction" in his activities of daily living and a "slight" limitation in maintaining social function. TR 73. Dr. Henson further indicated that Plaintiff "seldom" had deficiencies in concentration that resulted in a "failure to complete tasks in a timely manner," and "once or twice" had suffered

16

episodes of deterioration in a work-like setting. *Id*.

On December 2, 1994, Dr. Henson also completed a Mental Residual Functional Capacity Assessment of Plaintiff. TR 62-65. He noted a "moderate" limitation in Plaintiff's ability to carry out detailed instructions. *Id*. Dr. Henson determined that Plaintiff experienced "symptoms of depression that would impose limitations in his ability to perform detailed activities of some complexity." TR 65. He also determined that Plaintiff's cognitive and functional abilities were "adequate to perform routine activities," and that his interpersonal skills were "adequate for vocational involvement." *Id*.

On December 12, 1994, Vocational Assessment Specialist Jeff Edmonds opined that Plaintiff could "perform his past job" as a housing clerk because it remained within the limits of Plaintiff's December 1994 Residual Functional Capacity Assessment (RFC).[24] TR 75.

Plaintiff returned to Dr. Fleming on April 24, 1995.[25] TR 333.

In May 1995,[26] Dr. Hicks opined that Plaintiff suffered from "Bi-polar affective disorder," and that he was "depressed, unresponsive to any of the usual therapies to date . . . He has had a variety of anti-depressant medications[:] Lithium Carbonate, Tegretol, Depakote, responded partially to out-patient ECT but relapsed as soon as it was discontinued." TR 301. Dr. Hicks then opined: "Since I have known him he has not been well enough to perform any gainful employment, both due to his withdrawal and irritability, and markedly impaired concentration." *Id*.

_____

[24]Although the RFC was performed on December 2, it is dated December 9.

[25]The progress notes from this visit are illegible.

[26]The record contains medical records from December 2, 1994 through May 12, 1995, that are illegible. *See* TR 312-315.

On June 6, 1995, Dr. Daniel Pugh wrote Dr. Hicks after seeing Plaintiff for a "second opinion consultation." TR 316-318. He noted that Plaintiff's "ECT" treatment was initially effective, but then became only "partially" effective. TR 317. He noted that treatments with Elavil or Wellbutrin had not been effective, but that Plaintiff seemed to be "improving" on Luvox. TR 317-318.

On June 7, 1995, Dr. Henson again completed a Psychiatric Review Technique and an RFC of Plaintiff. TR 84-97. In the Psychiatric Review Technique, Dr. Henson noted the presence of an affective disorder, specifically, "Bipolar affective disorder, in partial control." TR 88-89. He also noted that Plaintiff had "moderate" difficulties in the "activities of daily living," and in "maintaining social functioning," but that Plaintiff "seldom" had deficiencies in concentration, and only "once or twice" had episodes of deterioration in a work-like setting which "caused the individual to withdraw from that situation." TR 95. In the RFC, Dr. Henson noted a "moderate" limitation in Plaintiff's "ability to carry out detailed instructions," and a "moderate" limitation in his "ability to interact appropriately with the general public." TR 84-85. Dr. Henson opined that Plaintiff's disorder would limit his "ability to perform detailed activities," and that, although Plaintiff had problems interacting with the general public on a routine basis, he possessed the cognitive and functional abilities to perform "simple routine activities." TR 86.

On June 27, 1995, Vocational Assessment Specialist Jim Anderson opined that the changes noted in Plaintiff's Mental Residual Functional Capacities Assessment on June 7, 1995, prevented him from performing any of the jobs that he had performed in the past. TR 98. Mr. Anderson concluded, however, that Plaintiff could not be considered disabled, and he opined that Plaintiff could obtain a position in the food preserving industries, such as a cannery worker, pie

18

baker, or steak tenderizer.  *Id.*

### B.  Evidence Considered in Plaintiff's June 1, 1998 Hearing

### 1. Medical Evidence[27]

Plaintiff was admitted to the Veteran's Administration Medical Clinic in Louisville, KY, on April 26, 1996, for depression and suicidal thoughts.  TR 363, 368-369.  Plaintiff was examined by Dr. Sarah E. Armstrong, who found that Plaintiff was not delusional, and that despite his suicidal thoughts, he was not suicidal.  TR 363, 368.  Because of Plaintiff's history of responding "well" on Nardil, Dr. Armstrong prescribed "Nardil 15 mg by mouth three times a day."  TR 368.  Dr. Armstrong noted that Plaintiff was given Chloral Hydrate 500 mg "at bedtime as necessary," and that Plaintiff had a tooth extracted.  *Id.*  Dr. Armstrong noted that Plaintiff was "pleasant and cooperative," and that he "participated in all activities." *Id.*

On February 12, 1997, Dr. El-Mallakh performed a mental status evaluation that revealed that Plaintiff had "slow" thought processes, with a "depressed" mood and "significant psychomotor retardation."  TR 362.  Dr. El-Mallakh diagnosed Plaintiff with "relapsed bipolar II depression despite compliance and RX."  TR 366.

Also on February 12, 1997, Plaintiff was admitted to the hospital in Louisville, KY, with symptoms of depression.  TR 360.  Plaintiff reported "slow motion, sleepy, slow thinking," and "thinking of death all the time."  *Id.*  Plaintiff reported a correlation between his diuretic and the onset of his depression.  *Id.*  Plaintiff's Lithium was increased to "1,800 per day, increased Depakote to 2 grams per day, increased Amoxapine to 400 mg at bedtime."  TR 361.  The doctor

---

[27]The record before the ALJ in Plaintiff's second hearing contained the following medical evidence in addition to the medical evidence discussed above.

19

noted that Plaintiff "appeared obsessed with helplessness and hopelessness, at times acknowledging being paranoid."[28] *Id*. Plaintiff was tapered off Amoxapine and started on Olanzapine. *Id*. On February 18, 1997, Plaintiff appeared "more alert, calm, no side effects of Olanzapine," and the physician reported that Plaintiff had "no anxiety" but was "still depressed." *Id*. On February 19, 1997:

> Plaintiff was not able to sleep, dark shadows observed under his eyes. He was not suicidal but "remained withdrawn, apathetic, no emotion and appeared over sedated. Valproic acid was decreased, Lithium changed to long acting and he was started on Buproprion 75 mg twice a day on which the patient had been in the past.

*Id*. On February 20, 1997, Plaintiff was reportedly "sleeping better." *Id*. His Buproprion was increased to 100mg twice a day. *Id*. The next day, however, Plaintiff "continued to be very depressed." *Id*.

Plaintiff was discharged on February 24, 1997. TR 364-365. The physician noted "continu[ing] depression" and "thoughts of death," as well as feelings of "hopelessness and worthlessness."[29] TR 365. Plaintiff was discharged with the following prescriptions:

> Olanzopine, 10 mg at bedtime. Depakote 250 mg each a.m., 500 mg at noon and 750 mg at bedtime. Lithium carbonate CR, 400 mg one in the a.m. and two at bedtime. Buproprion 100 mg twice daily. Benadryl 50 mg at bedtime. Cardura 2 mg at bedtime. Synthroid 100 mg each a.m.

TR 360.

On February 27, 1997, Plaintiff was admitted to the National Institute of Mental Health (NIMH). TR 431-433. The examining physician noted that, upon arrival, Plaintiff appeared

---

[28]The physician's name is not listed on the reports.

[29]The name of the physician is unknown.

20

calm, with a "fairly flat affect, able to smile when provoked."[30]  TR 433.

On March 11, 1997, Dr. Tim Kimbrell wrote Social Security officials informing them that Plaintiff was "admitted under my care at the National Institute of Health 2/27/97."  TR 359. Plaintiff was admitted to "participate in research protocols that are investigating experimental treatments for his disabling illness."  *Id*.  Dr. Kimbrell "could not give a timetable to the length of his stay on our inpatient unit.  It is my opinion that he is currently not able to work with the current degree of depressive symptoms."  *Id*.

In a letter dated March 14, 1997, Dr. El-Mallakh opined that "the severity, refractoriness to treatment, and frequent recurrence of these depressions do not allow for any period of sufficient stability to allow Mr. Christian to be able to work."  TR 371.  Dr. El-Mallakh also stated, "I have recommended to Mr. Christian that he partake in a research program at the National Institute of Mental Health . . . Investigating the utility of transcutaneous magnetic stimulation."  *Id*.

From March 13, 1997 to March 20, 1997, hospital progress reports indicated that Plaintiff suffered from "Hi mod[erate] to low severe depression."  TR 429.  Plaintiff reported that he felt that he was "slowing down to die."  *Id*.

On March 25, 1997, Plaintiff underwent a "PET scan" to determine "regional cerebral glucose metabolic correlates of spontaneous and drug-induced clinical changes in mood and anxiety disorders."[31]  TR 428.

On March 26, 1997, Dr. Mark A. Frye performed a lumbar puncture on Plaintiff.  TR

_____

[30]The physician's name is illegible.

[31]No results were given for this procedure.

426. "Approximately 30 cc clear csf was removed without difficulty." *Id*. "No masses or focal lesions" were found. *Id*.

On March 27, 1997, hospital progress notes reported that Plaintiff "believes he is very sick [and] that he has lost his mind;" however, the physician indicated that there was "no evidence of psychosis."[32] TR 425.

In April 1997, hospital progress notes indicated that Plaintiff experienced "Moderate depression," with periods of "improved" mood and motion, and "lowered" anxiety. TR 424-425.

In May 1997, hospital progress notes indicated that Plaintiff suffered from depression. TR 422-424.

Throughout June 1997, hospital progress notes indicated that Plaintiff suffered from "moderate-severe" depression. TR 421-422, 424. On June 29, 1997, Dr. Frye performed another lumbar puncture on Plaintiff. TR 420. Again, "Approximately 30 cc clear csf was removed without difficulty." *Id*. "No masses or focal lesions" were found. *Id*.

Throughout July 1997, hospital progress notes indicated that Plaintiff experienced "moderate/severe depression," with "passive suicidal ideation, but no plan."[33] TR 417-418. Also in July, Plaintiff was treated for tooth decay and gingivitis. TR 436-440.

In August 1997, Plaintiff noticed "significant improvement."[34] TR 417.

On August 23, 1997, Plaintiff underwent another "PET scan" to determine "regional cerebral blood flow correlates of spontaneous and drug-induced clinical changes in mood

---

[32]The treating physician's name is illegible.

[33]Many dates from the July notes are illegible.

[34]Many of the progress notes from these dates are brief and illegible.

22

disorders."[35]  TR 416.

On August 26, 1997, Dr. Elizabeth A. Osuchm performed another lumbar puncture on Plaintiff.  TR 415.  Again, "Approximately 30 cc clear csf was removed without difficulty," and "no masses or focal lesions" were found.  *Id*.

Throughout September 1997, Plaintiff experienced "moderate" depression.  TR 412-413.  On September 18, 1997, Plaintiff's records indicated "high moderate depression in "phase #3."  TR 412.  Plaintiff experienced "fleeting suicidal thoughts, but no plan or intent of suicide."  *Id*.  On September 25, Plaintiff "denied suicidal thoughts," and reported that he was getting "good sleep" and engaging in activities.  *Id*.

On September 30, 1997, Dr. Kimbrell again wrote Social Security officials, stating that since Plaintiff had been admitted to NIMH in February, he had "not responded" to transcranial magnetic stimulation (TMS), although "blinded protocol trials of the anticonvulsants [Lamotrigine and Gabapentin] look promising."  TR 373.

On October 8, 1997, Plaintiff underwent another "PET scan" to determine "regional cerebral blood flow correlates of spontaneous and drug-induced clinical changes in mood disorders."  TR 411.[36]

On October 9, 1997, Plaintiff's records indicate that he "finished LAGABA phase #3."  TR 410.  The record also noted "Mood has been in moderate/severe range."  *Id.*

Also on October 9, 1997, Dr. Osuchm performed another lumbar puncture on Plaintiff.  TR 409.  Again, "Approximately 30 cc clear csf was removed without difficulty," and "no

---

[35]The record does not contain the results of this procedure.

[36]The results of this procedure were not included in the record.

masses or focal lesions" were found.  *Id*.

The October 1997 progress notes indicated that, in late October, Plaintiff experienced "some improvement" in his depression.[37]  TR 434.

In December 1997, Dr. Kimbrell wrote a letter to the ALJ regarding Plaintiff's condition.[38]  TR 441-442.  In his letter, Dr. Kimbrell informed the ALJ that, "Mr. Christian has a diagnosis of bipolar disorder, type II.  He has had hypomanic periods in the past, but the disabling aspect of his illness is pervasive depression."  TR 441.  Dr. Kimbrell noted that Plaintiff's illness had been disabling "from both occupational and social perspectives" and had been "refractory to treatment."  *Id*.  He wrote that Plaintiff had not responded well to medication, "ECT," or "transcranial magnetic stimulation."[39]  *Id*.  Dr. Kimbrell noted that Plaintiff was participating in a blinded experiment where Lamotrigine and Gabapentin were combined with sleep deprivation.  TR 441-442.  Dr. Kimbrell opined that "[Plaintiff's] most pressing medical need is to concentrate on continued treatment."  TR 442.  Dr. Kimbrell concluded: "His prognosis is poor, but we will be working with his Veteran's Administration physicians to continue experimental treatments."  *Id*.

On March 24, 1998, Dr. Lois J. Rifner completed a psychological evaluation of Plaintiff for the Disability Determination Bureau, that included a Mental Status Examination, the Bender Gestalt test, the Rorschach test, the Minnesota Multiphasic Personality Inventory, Second

---

[37]Many of these records are illegible.

[38]The letter to ALJ is undated.  It was stamped by the ALJ's office, however, on December 15, 1997.  TR 442.

[39]Dr. Kimbrell explained that transcranial magnetic stimulation is a daily treatment, "which has been effective in some refractory patients."  *Id*.

24

Edition (MMPI-II), the Rey 15 Item Test, and a Medical Assessment Form.  TR 377-392.  Dr.

Rifner noted that Plaintiff claimed that he was then in "complete remission, having had no

symptoms of depression since November 15, 1997."  TR 378.  During Plaintiff's Mental Status

Examination, Dr. Rifner noted that "his facies and attitude were consistent" with not having any

symptoms of depression at the time of the examination.  TR 379.  Dr. Rifner, noted that Plaintiff

"appeared to be functioning quite well in the cognitive sphere," and "indicated a rather

phenomenal ability to concentrate and to subtract–although he complained of great difficulty in

concentrating when depressed."  TR 380.

Dr. Rifner noted that Plaintiff "exhibited no difficulty in reproducing Bender designs.

There is no evidence of any cognitive problems."  TR 381; *see also* TR 385-386.  On the

Rorschach test, Plaintiff's abilities "Indicated a person who is reasonably intelligent but who is

lackadaisical and doesn't always achieve to potential."  TR 381.  Dr. Rifner observed that there

was "no evidence of psychosis and little of depression."  *Id*.  The MMPI-II revealed the

following profile for a person similar to Plaintiff:

> Is experiencing a great deal of emotional turmoil . . . tending to be
> anxious, nervous, tense, and high-strung.  They worry excessively
> and feel vulnerable to real and imagined threat.  They may have
> many vague somatic complaints.  They tend to brood about their
> problems and often show signs of clinical depression.

TR 382.

Dr. Rifner noted that Plaintiff "doesn't want to get a job when he is feeling better,

because he is sure that his depression will return."  TR 383.  Dr. Rifner concluded that Plaintiff

had "absolutely no evidence of memory or cognitive impairment.  Concentration is excellent.

Neurological functioning, as evidenced on the Bender, is good.  There is no evidence of any

thought disorder."  TR 384.  Dr. Rifner diagnosed Plaintiff with "Major Depression, recurrent, in

25

full remission," and noted that "[Plaintiff's mother] seems unusually involved in her son's problems, and one wonders if she may not contribute to his recurring depression to some degree by knowing 'before anyone else that he is getting sick.'" *Id*.

## 2. Plaintiff's Testimony

Plaintiff was born on June 10, 1955, and is a high school graduate. TR 447, 449. Plaintiff testified that he had been employed as a government housing clerk. TR 447. He further testified that he had also been employed as a statistical clerk with the Census Bureau for six months, as a security guard from September 1992 until May 1993, and as a security guard at Sears from November 1990 through February 1991. *Id*. He answered in the affirmative when the ALJ asked if he had worked as a guard from August 1995 until the end of January or the beginning of February in 1996. TR 447-448. During that time, he earned $3,237. *Id*. Plaintiff reported that the job ended when he quit, and he stated that he "always quits before he embarrasses himself or hurts someone." TR 448. Plaintiff testified that he had also worked for five to six weeks doing factory work with a temporary agency ("Select A Temp") in 1996. *Id*. Plaintiff stated that he had not worked since that time. *Id*.

Plaintiff testified that he had "52" college credits towards an associates degree in industrial maintenance. TR 449. He also stated that he had around "70 quarter hours" in criminal justice that he had earned while in the Air Force. *Id*. He stated that he had been in the Air Force "14 years, 7 months, 28 days," and that he was discharged January 16, 1989, for the medical condition of chronic major depression. TR 449-450.

Plaintiff testified that, during the day, he worked for his parents, with whom he lived, wrote letters to friends, helped with yard work, and liked to work on cars. TR 452. He stated that the previous Sunday, he had replaced a battery on a car and had tried to "remove the

blower." *Id.*

Plaintiff stated that there had been a history of depression in his family, but no clinical cases. TR 457-458. He reported that his oldest son had a history of "violent, aggressive behavior," and would not take his medicine. TR 458. Plaintiff testified that his mother, brother, and nephew all took anti-depressants. *Id.*

Plaintiff testified that he had been under treatment for his condition at the Veteran's Administration in Louisville, KY, and that he had spent ten months as an inpatient at the National Institute of Health in Bethesda, MD. TR 450. Plaintiff stated that at the beginning of February, 1997, he was in the Louisville hospital for two weeks and then was transferred to Bethesda. TR 452. He stated that he took Lamotrigine and Gabapentin, also known as Lamictal and Neurontin, 325 mg per day and 2400 mg per day, respectively. TR 450. Plaintiff testified that it was hard to know exactly what the effects of the medication were on him because he had just come out of a twenty-one month severe depression. TR 451. He said there had been no side effects, but did not know if the medication was helpful or whether his improvement was simply a result of remission. *Id.* He said that the medication did not make him tired or decrease his concentration. *Id.* He stated that he had a driver's licence, and that he drove to the store when it was necessary. *Id.*

Plaintiff testified that he had gone into "complete remission" on December 10, 1997, with the remission starting at the beginning of November. TR 453. He testified that, at the time of the hearing, he did not believe that he had any depression, and that he thought that he would be able to work, but added, "I never know how long its going to last." *Id.*

Plaintiff explained that his relapses seemed to last longer each time and the subsequent remissions seemed shorter. *Id.* He testified that in 1988, he had an eighteen month depressive

27

period, and a "pretty good period in between" episodes. *Id*. Plaintiff reported that, in November 1993, he had had a nineteen month depression. *Id*. He stated that just when he thought that his depression would not return, five or six months later, it would happen again. TR 453-454. He testified that, at the time of the hearing, his remission had lasted six months immediately after his twenty-one months of depression, of which he had spent ten months in Bethesda. TR 454-455. Plaintiff stated that he went into remission just before he left the hospital. TR 455. Plaintiff stated that he felt that the National Institute of Health at Bethesda was the best place for him to be. *Id*. Plaintiff reported that, prior to the onset of his last bout with depression, he had been in remission from the end of his closed Social Security period (August 1995) until February 1996. TR 458.

Plaintiff testified that he had tried "23 different medications or combinations thereof," and that the medications that he then took were anti-convulsants that were being researched as mood stabilizers. TR 455-456. He also reported that the medications had seemed to have "stabilized" his moods "reasonably well." TR 456. He stated that each of the medications that he took only worked a "little bit" individually, but together they worked, providing "gradual improvement." *Id*. He stated that the doctors had tried a Lithium/Nardol combination, which only worked for two weeks. *Id*. He stated that he did not understand why medications seemed to work for a time, but then stopped working. *Id*.

Plaintiff testified that, although he had been experiencing remission for almost six months, he was worried about the depression returning. TR 457. He reported that, in the early 1990's, he had had relapses that lasted five months. *Id*. Plaintiff stated that he hoped that if he could "feel good" for "maybe a year and a half, two years," that his condition would have improved. *Id*. Plaintiff testified that he visited the doctor about once a month to get his

28

medications refilled.  TR 470.

### 3.  Testimony of Barbara J. Wade, Plaintiff's Mother

Plaintiff's mother, Barbara J. Wade, also testified at Plaintiff's hearing.  TR 460-462.

Ms. Wade testified that Plaintiff had been living with her since he got out of the hospital in

December 1997.  TR 460.  She testified that Plaintiff did not do as much work around the house

as he had claimed, but that she believed that he was in remission.  TR 460-461.  Ms. Wade

testified that she believed that Plaintiff was in remission because "he is not suicidal or he can't

–he will watch t.v. where he wouldn't before and he will carry conversation."  TR 461.  She

testified that she was very concerned about him, but she reiterated that she thought that he was

"doing very well."  *Id*.  She said that she worried, however, that Plaintiff's depression would

suddenly come back.  *Id*.

Ms. Wade testified that, despite the fact that the last job he took as a temporary worker

was easy, he struggled at it:

> It was a minor–I mean, a kid could've done this job from what he
> told me. It was putting a filter in a box and some files around it and
> then they had to fold it up and stamp it. And he'd tell me every
> morning Mom, pray for me today that I get by through the day and
> I think jeez, but it's so simple. A child could do it.

TR 461.

Ms. Wade also testified that she disagreed with the report that Dr. Rifner made that

suggested that events in Plaintiff's life triggered depressive episodes.  TR 462.  She also

disagreed that she might be a trigger herself.  *Id*.

### 4.  Testimony of Dr. Gary Maryman, Medical Expert

Medical Expert ("ME"), Dr. Gary Maryman, also testified at Plaintiff's hearing.  TR 462-

466.  Dr. Maryman testified that he was a clinical psychologist who had been in private practice

29

since 1990.  TR 462-463.  He opined that Plaintiff suffered from "Major depression, recurrent, severe without psychotic features," that is "Parenthetically in remission since December of '97." TR 463.

The ME testified that Plaintiff's Global Assessment of Functioning score would average around 70, although in periods of depression, it would dip closer to mid-to-lower 50's.  TR 464. The ME opined that, between 1995 and the end of 1997, Plaintiff suffered a severe depression which would have made Plaintiff unable to deal with stress and deal with others in terms of work activity.  *Id.*

The ME further testified that Plaintiff "likely would've met the listing during that period" which would have been a "12.04" from "February of '96 until December of '97."  TR 465.  The ME stated that "currently, I think the issue is less than severe.  Apparently, not severe."  *Id.*  He stated that Plaintiff did not have any "severe impairments in any domains," and "no functional limitations."  *Id.*

Plaintiff asked the ALJ "what them [*sic*] numbers mean."  TR 466.  The ALJ responded that they were a degree of impairment.  *Id.*  Plaintiff responded that his impairment was so bad that for many months, his plan every day was just to "stay alive."  *Id.*

### 5.  Testimony of Robert Piper, Vocational Expert

Vocational Expert ("VE"), Robert Piper, also testified at Plaintiff's hearing.  TR 466.

With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's past relevant work experience as a nuclear security officer in the Air Force from 1974 to 1984 would be classified as "medium work and semi-skilled," and that Plaintiff's past relevant work experience as an aircraft mechanic would be classified as "medium work, skilled."  TR 467.  The VE reported that the aircraft maintenance skill had an "SVP" of seven, and that the security

officer had an "SVP" of four.  *Id.*

The VE testified that Plaintiff's job as a dishwasher was not relevant, and that Plaintiff's job in "retail loss production, which was another security job," from December 1989 to February 1991, would be classified as "light work and semi-skilled, also an SVP of four." *Id.*  The VE reported that Plaintiff had also worked as a sales clerk for less than three months, and as a "security officer, gate guard," which would be classified as "light work and entry-level semi-skilled, SVP of three."  *Id.*  The VE further reported that, from May 1993 to November 1993, Plaintiff had worked as a "statistical clerk with the Census Bureau," which would be classified as "light work . . . sedentary work.  It's semi-skilled at SVP of four."  TR 467-468.

VE testified that Plaintiff had worked as a housing clerk for less than three months, and that Plaintiff had also worked as a security guard from August 1995 until January 1996, both of which would be classified as "light and entry-level semi-skilled."  TR 468.  Finally, the VE noted that Plaintiff had worked as a hand packager, which would be classified as "either light or medium work."  *Id.*

The VE then testified as to the stress level of the aforementioned jobs.  TR 468-469.  He stated that the stress level would vary, with the aircraft mechanic job being the most stressful. TR 468.  He classified that job as a "moderate to higher level of stress position," but stated that the security guard jobs were "moderately stressful," and that the hand packaging job and the statistical clerk would have been the least stressful, with "low to moderate stress for those jobs." TR 469.

The ALJ concluded his examination of the VE by asking, "Dr. Maryman has indicated that there are no limitations.  That would–none of these would be affected by that?"  TR 469. The VE replied, "No sir, they would not."  *Id.*  The ALJ then asked, " But the ones that

31

would–even with the least amount of stress would be the clerk and the hand packer, is that correct?" *Id.* The VE responded, "Yes, Your Honor." *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

32

(*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

33

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[40] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*,

---

[40]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that, "The ALJ in assessing medical improvement failed to follow 20 CFR § 404.1594(c)(iv) in considering [that Plaintiff's] Major Depression was subject to temporary remission and relapse." Docket Entry No. 8. Specifically, Plaintiff argues that the ALJ erred because he did "not follow the requirements of 20 CFR § 404.1594(c)(iv)," did not "comment on Dr. Kimbrell's assessment that [he] does have periods where he is able to function better," did not "preform [*sic*] a longitudinal history of the claimant's prior relapses," and did not "ask the medical expert that was at the hearing any of [*sic*] questions regarding the likelihood of a relapse." *Id.* Plaintiff argues that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be remanded for a rehearing to specifically determine whether his remission was temporary. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff does not dispute that he was in full remission at the time of his hearing; rather,

Case 3:03-cv-01033   Document 12   Filed 12/14/05   Page 35 of 38 PageID #: 35

Plaintiff argues that, "Because he was subject to future relapse the ALJ should have considered that issue" as required by 20 CFR § 404.1594(c)(iv).  Docket Entry No. 8.

20 CFR § 404.1594(c)(iv) states:

In some cases the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, we will be careful to consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsenings.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.

As an initial matter, the record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence" to support his decision.  Moreover, the ALJ's decision demonstrates that he carefully considered not only the objective medical evidence of record, but the testimony of Plaintiff, the ME, and the VE as well.  *See* TR 17-19.

Although Plaintiff argues that, "Because he was subject to future relapse the ALJ should have considered that issue," Plaintiff has failed to demonstrate that the ALJ did not do so.  In fact, the ALJ clearly considered the issue of medical improvement during the hearing, questioning Plaintiff on the length of the remission and the possibility of the return of his depression.  *See* TR 457-459, 473.  Despite Plaintiff's assertions to the contrary, the ALJ also considered the "longitudinal history" of Plaintiff's condition, and specifically discussed this history in his decision.  *See, e.g.,* TR 453-454, 17-19.  In the hearing, the ALJ asked Plaintiff to explain the length of the remission periods.  TR 453-454.  Plaintiff explained how each period of remission seemed shorter, followed by a longer depression.  *Id*.

Additionally, the ALJ, in his decision, specifically stated:

The undersigned has also considered the claimant's argument that he is only experiencing a brief remission, and that he will be

36

> incapacitated by his depression again quite soon. While it is
> certainly possible that he may relapse again soon, he has been in
> remission for over six months now, and there is no evidence
> suggesting that his remission will not last for another six months or
> longer. The claimant's fears are entirely understandable, but
> disability determination is based upon actual limitation rather than
> the possibility of future limitation.

TR 18.

While it is true that Plaintiff had an extensive history of depression that included several periods of remission and relapse, it is also true that Plaintiff testified that, at the time of his hearing, he had been in full remission for approximately six months. The ALJ, in his detailed, articulated rationale, discussed, *inter alia*, both of these points. There is no support for Plaintiff's argument that the ALJ "failed to follow 20 CFR § 404.1594(c)(iv) in considering [that Plaintiff's] Major Depression was subject to temporary remission and relapse." The ALJ complied with the Regulations, and ALJ's decision was supported by substantial evidence. The ALJ's decision, therefore, must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a

37

waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:03-cv-01033   Document 12   Filed 12/14/05   Page 38 of 38 PageID #: 38